## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | 8:13CR275 |
| vs. | |
| CARLOS ARMANDO CORONA-SANCHEZ, | FINDINGS AND RECOMMENDATION |
| Defendant. | |

This matter is before the court on the motions to suppress (Filing Nos. 60, 61, and 62) filed by defendant Carlos Armando Corona-Sanchez (Corona-Sanchez). Corona-Sanchez is charged in the Superseding Indictment along with Yohan Noe Lopez-Acosta (Lopez-Acosta), Edgar Herberto Rodriguez-Morales (Rodriguez-Morales), and Juan Carlos Vargas-Garcia (Vargas-Garcia), with a conspiracy to distribute more than 500 grams of methamphetamine during the period of November 27, 2012, and July 16, 2013 (Count I) in violation of 21 U.S.C. § 841(a)(1). **See** Filing No. 48. Corona-Sanchez is also charged in a Forfeiture Allegation, involving seizures of various amounts of U.S. currency in violation of 21 U.S.C. § 853. *Id*. Corona-Sanchez seeks to suppress: (1) evidence obtained from a GPS location data search warrant and court order (Filing No. 60); (2) statements made by Corona-Sanchez to law enforcement officers in California on July 16, 2013 (Filing No. 61); and (3) evidence seized by law enforcement officers from Corona-Sanchez's California apartment on July 16, 2013 (Filing No. 62).

The court held an evidentiary hearing on May 6, 2014. Corona-Sanchez was present with his counsel, Barbara J. Thielen. The United States was represented by Special Assistant U.S. Attorney Martin J. Conboy, IV. The court heard the testimony of Special Agents Zach Wimer (Agent Wimer), David Stone (Agent Stone), and George Fernandez (Agent Fernandez) of the Department of Homeland Security Investigations (HSI). The court received into evidence: Search Warrant Application (Ex. 1); Consent to Search - Apartment (Ex. 2); Consent to Search - Red Chevrolet (Ex. 3); *Miranda* Card (Ex. 4); DVD of recorded call (Ex. 101); Transcription of recorded call (Ex. 102); and Garcia-Hein transcription of recorded call (Ex. 103). Marked but not offered or

received were:  Advice of rights (Ex. 104); Photo taken at Wal-Mart (Ex. 105); and the Report of Agent Stone (Ex. 106).  The court also took judicial notice of the search warrant and order concerning Corona-Sanchez's cellular phone, in addition to the affidavits supporting each (8:13MJ221 - Filing Nos. 1 and 2 - Sealed).

A transcript (TR.) of the hearing was filed on May 13, 2014 (Filing No. 77).  There was no post-hearing briefing.

## FINDINGS OF FACT

### A.  Omaha, Nebraska Investigation

On July 15, 2013, in Omaha, Nebraska, Special Agents Reisz and Allrich (Agent Allrich) of HSI, as part of an investigation, approached Lopez-Acosta and placed him under arrest for being illegally present in the United States without authorization (TR. 27).  The agents read Lopez-Acosta his *Miranda* rights (TR. 26-27).  Lopez-Acosta waived his rights and subsequently consented to a search of his apartment (TR. 27, 28). HSI agents discovered approximately 2.7 pounds of methamphetamine inside the apartment, as well as an additional 10 pounds of methamphetamine inside a Jeep Cherokee in garage number 52 of the apartment complex (TR. 28).  Lopez-Acosta informed the agents the narcotics in his garage belonged to a man he knew only as "Gordo" and two individuals were scheduled to arrive shortly to retrieve the narcotics in the garage (TR. 28-30, 39, 40).  Lopez-Acosta subsequently engaged in a consensually-monitored phone call with Gordo, which confirmed for the agents two individuals would arrive in an hour-and-a-half to retrieve the narcotics (TR. 28-30, 39, 40).

Agents continued to monitor Lopez-Acosta's apartment until approximately 11 P.M., at which time Agent Allrich sought a search warrant for Gordo's cellular phone, using the number Lopez-Acosta provided (TR. 40, Ex. 1; 8:13MJ221 - Filing Nos. 1 and 2).  In addition to the warrant, Agent Allrich requested an order directing Sprint/Nextel Corporation (Sprint) to provide HSI with GPS location data pertaining to the phone's location (TR. 40; Ex. 1; 8:13MJ221).[1]  In his affidavit and application requesting the

---

[1]  Counsel and the testifying agents refer to this order as a "PING order."  **See, e.g.,** Filing No. 77 - TR. p. 33, 109-112.  A PING order provides agents GPS location data emitting from a target's cellular phone

warrant and order, Agent Allrich indicated the proposed warrant and order was in relation to a violation of 21 U.S.C. §§ 841(a)(1) and 846 (Ex. 1; 8:13MJ221 - Filing No. 1).  Agent Allrich believed probable cause existed to issue the warrant and order (1) based on the methamphetamine found at Lopez-Acosta's apartment, (2) Lopez-Acosta's statement the narcotics belonged to Gordo, and (3) because agents believed the consensually-monitored phone call corroborated Lopez-Acosta information:  i.e., Gordo would be sending people to retrieve the narcotics (Ex. 1).  Additionally, Agent Allrich believed the GPS location data from the target cellular phone would lead to evidence of drug trafficking and the identification of individuals engaged in drug trafficking (Ex. 1).  United States Magistrate Judge Gossett (Judge Gossett) from the United States District Court for the District of Nebraska issued the search warrant and order pursuant to 18 U.S.C. §§ 2703(c)(1)(A) and 2711(3)(A), and Federal Rule of Criminal Procedure 41 (Ex. 1).  Agent Wimer executed the search warrant on July 15, 2013, at 9:00 P.M. (Ex. 1).[2]

## B. Downey, California Investigation

On July 16, 2013, Agent Wimer received information from Sprint the GPS location data showed the cellular phone Lopez-Acosta called on July 15, 2013, was at 8141 Stewart and Gray Road in Downey, California (TR. 34).  Agent Wimer noted the phone was frequently at this location (TR. 34, 53, 62).  Agent Wimer also recognized the address from the results of a GPS tracker placed on a vehicle related to this investigation (TR. 32-34).[3]  Agent Wimer contacted HSI Agent Stone in Los Angeles

_____

number.  **See** Ex. 1; 8:13MJ221 - Filing No. 1.  More specifically, the GPS location data "provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers." **See** *id.*

[2]  Although the government did not provide evidence of when the order was served on Sprint, presumably the agents served the order as Sprint relayed GPS location data to Agent Wimer.

[3]  Agent Wimer testified agents installed a GPS tracking device on a BMW X5 sometime before July 15. **See** Filing No. 77 - TR. p. 31-33.  Agents installed the GPS tracker when the BMW X5 was in Lopez-Acosta's possession in Omaha, Nebraska.  *Id.*  Eventually the BMW X5 traveled to Los Angeles, California.  *Id.*  While en route to Los Angeles, the BMW X5 stopped at a Walmart.  *Id.*  Agents were able to obtain a photograph of the BMW X5's occupants from Walmart's surveillance cameras.  *Id.*  Agents suspected the photograph was a picture of Gordo; however, the agents did not know who the person in the photograph was other than an occupant of a vehicle involved in their investigation.  *Id.* at 31-33, 42-44.  The parties did not submit this photo into evidence.  Corona-Sanchez does not raise any arguments related to the GPS tracker warrant on the BMW X5 or the Walmart photograph.

and informed Agent Stone of an ongoing methamphetamine investigation in Omaha (TR. 52). Agent Wimer relayed the target of the investigation was near Los Angeles and asked Agent Stone for assistance in locating the target (TR. 52). Agent Wimer informed Agent Stone the target's name was Gordo, explained he was a heavy-set Hispanic male, and 8141 Stewart and Gray Road was the address generated from the GPS signal of the cellular phone communicating with Lopez-Acosta (TR. 52, 53, 62, 76). Agent Wimer also informed Agent Stone that Gordo drove a red Chevrolet pickup with distinctive red rims (TR. 45). Lastly, Agent Wimer provided Agent Stone with the Walmart photograph of an individual Agent Wimer suspected was Gordo (TR. 31).

Agent Stone proceeded to the location of the GPS signal in order to conduct surveillance (TR. 53). While there, he encountered an electric rolling gate residents used to gain access to an apartment complex (TR. 53). Agent Stone did not receive permission to enter the parking lot to the apartment complex; however, as a resident opened the gate, Agent Stone drove inside and observed the red Chevrolet pickup with distinctive red rims Agent Wimer had previously described to him (TR. 54, 55, 64). After locating the red Chevrolet pickup, Agent Stone exited the parking lot and six additional HSI agents joined him to assist in further surveillance and to provide support should the circumstances require law enforcement action (TR. 65-66). Agent Fernandez was part of this group of additional agents (TR. 55). While conducting surveillance from across the street in his vehicle, Agent Fernandez could see inside the parking lot (TR. 76, 89). At 12:30 P.M., Agent Fernandez witnessed a heavy-set individual matching the target's description exit the apartment complex with a female and leave inside a white SUV (TR. 55, 56, 67, 76). Agent Stone called Agent Wimer to ask whether the GPS signal from the target's phone showed movement in the same direction as that of the individual matching the physical description of the target (TR. 57). Agent Wimer informed Agent Stone the cellular phone signal was moving (TR. 57). Agent Stone relayed this information to agents following the white SUV (TR. 57, 68). The agents tailing the white SUV subsequently conducted an investigative traffic stop (TR. 68, 69). The purpose of stop was to identify if the male occupant was the individual Agent Wimer sought in the Omaha investigation (TR. 71, 79). Because the occupants of the white SUV spoke Spanish, Agent Fernandez was summoned to the site of the traffic stop to provide

4

Spanish-speaking assistance (TR. 76, 77).   Agent Fernandez arrived roughly fifteen minutes after the initial stop (TR. 90).

Upon his arrival, Agent Fernandez observed the male occupant of the vehicle seated on the curb in handcuffs (TR. 77).   Agent Fernandez informed the man that he was being detained for immigration reasons and asked for his name, date of birth, address, why he was in the United States, and what he was doing, in addition to whether he had any drugs, guns, or money in his home (TR. 77-79, 92).   The man responded his name was Carlos Corona-Sanchez, he was in the United States illegally, and he did in fact have cash at his apartment (TR. 77-78).   Corona-Sanchez orally consented to a search of his apartment and signed a consent to search form for the same location (TR. 80, 106; Ex. 2).   The duration of Agent Fernandez's questioning totaled approximately ten minutes (TR. 95).   Agent Fernandez spoke with Corona-Sanchez in a casual manner, and although he was not free to leave during the traffic stop, HSI agents never displayed any weapons or made threatening gestures toward him (TR. 78, 92).   Agent Fernandez testified Corona-Sanchez did not appear to be under the influence of drugs or alcohol at the time of the traffic stop and appeared to be of average intelligence (TR. 78).

During the stop, Agent Stone took a photograph of Corona-Sanchez (TR. 33-34, 59-60).   Agent Stone sent the photograph to Agent Wimer who then relayed the photograph to Lopez-Acosta and the two individuals who attempted to retrieve the narcotics Omaha (TR. 47, 49-50, 59-60).   All three positively identified Corona-Sanchez as the person they knew as Gordo (TR. 47, 49-50, 59-60).   Agent Wimer confirmed with Agent Stone that Corona-Sanchez was the target of Agent Wimer's investigation (TR. 59-60).

After Corona-Sanchez signed the consent to search form, HSI agents transported him back to his apartment in one of their vehicles (TR. 81).   Before entering the vehicle, Corona-Sanchez's handcuffs were repositioned in front of him for comfort (TR. 92).   Upon their arrival at the apartment, Agent Fernandez and Corona-Sanchez waited as HSI agents did a protective sweep of the apartment (TR. 81).   After agents deemed the apartment safe, they escorted Corona-Sanchez to a room and read him his ***Miranda*** rights from a department-issued card (TR. 81).   The card included a question

asking whether Corona-Sanchez would be willing to waive his rights and speak with them (TR. 82, 83).  Corona-Sanchez replied, "Yes," and informed Agent Fernandez that he had approximately $50,000 cash inside the apartment and the majority of the money was proceeds from the sale of narcotics (TR. 83).  Upon the conclusion of the interview, Corona-Sanchez was transported to the Bell Police Department where he was held on immigration violations (TR. 101).

### C.  Post-Arrest Interview

The following day, on July 17, 2013, HSI agents conducted another interview with Corona-Sanchez at an interview room within the Bell Police Department (TR. 85, 102).   Prior to questioning, Agent Fernandez reminded Corona-Sanchez he had received and waived *Miranda* rights the previous day and asked if Corona-Sanchez would be willing to speak further about the events of July 16, 2013 (TR. 102).  Corona-Sanchez indicated he remembered his *Miranda* rights and he would speak with HSI agents (TR. 102).   During the interview, Corona-Sanchez identified the individuals detained by HSI agents in Omaha (TR. 85, 86).

## LEGAL ANALYSIS

Corona-Sanchez argues all evidence procured by HSI in Los Angeles should be suppressed as fruit of the poisonous tree under the Fourth Amendment because (1) the search warrant and order issued for Corona-Sanchez's cellular phone was issued by a magistrate without proper jurisdictional authority, (2) the search warrant was facially invalid because it lacked probable cause, (3) he did not knowingly, voluntarily, and intelligently provide consent to search his apartment, and (4) Corona-Sanchez was unlawfully detained during the traffic stop, thereby rendering any and all subsequently obtained evidence inadmissible.  **See** Filing No. 60 - Motion p. 1-3; Filing No. 62 - Motion p. 1-2; Filing No. 65 - Brief p. 12.

Additionally, Corona-Sanchez argues any statements he made during the investigation were done so while he was in custody, under arrest, or when he was otherwise deprived of his liberty.  **See** Filing No. 61 - Motion p. 1-2.  He contends each of his statements was provided in the absence of proper *Miranda* warnings and his

statements were not made freely, voluntarily, or intelligently.  *Id*.  As a result, he claims all statements made to HSI agents should be suppressed as violations of the Fifth Amendment.  *Id*.

## A.  Fourth Amendment Claims

### 1.  Search Warrant

#### i. Jurisdictional Authority

Corona-Sanchez argues Judge Gossett did not have the proper authority to issue the search warrant and order pertaining to Corona-Sanchez's cellular phone.  **See** Filing No. 60 - Motion p. 1-3.

"A governmental entity may require a provider of electronic communication service . . . to disclose a record or other information pertaining to a subscriber . . . only when the governmental entity . . . obtains a court order for such disclosure."  18 U.S.C. § 2703(c)(1)(b).

> A court order for disclosure . . . may be issued by any court that is a court of competent jurisdiction and shall issue only if the governmental entity offers specific and articulable facts showing that there are reasonable grounds to believe that the contents of . . . [an] electronic communication . . . or the records or other information sought, are relevant and material to an ongoing criminal investigation.

18 U.S.C. § 2703(d).  A court of competent jurisdiction is "any district court of the United States (including a magistrate judge of such a court) or any United States court of appeals that has jurisdiction over the offense being investigated."  18 U.S.C. § 2711(3)(A)(i).

Corona-Sanchez relies on 18 U.S.C. § 2703(c)(1)(a) and Federal Rule of Criminal Procedure 41 to assert the search warrant and order were invalid.  **See** Filing No. 60 - Motion p. 1-3; Filing No. 65 - Brief p. 6-8.  However, Corona-Sanchez overlooks the application of 18 U.S.C. § 2703(c)(1)(B) and (d).  The language of § 2703(c)(1)(B) and (d) expressly permits a court of competent jurisdiction to issue an order for information pertaining to an electronic communication provider's customer upon a showing of specific and articulable facts demonstrating the information is likely related to ongoing criminal activity.  This requirement is less exacting than the showing

of probable cause necessary for the issuance of a search warrant.  **See *In re App. of U.S. for an Order Directing the Provider of an Elec. Commc'n Serv. to Disclose Records to the Gov't***, 620 F.3d 304, 312-13 (3rd Cir. 2010) (stating the standard for issuing an order under § 2703(c)(1)(d) is governed by the text of the statute, and by requiring a showing of probable cause, the Magistrate Judge erred by allowing "her impressions of the general expectations of privacy to . . . transform the standard into [something] else").

This court need not reach the issue whether Judge Gossett had jurisdictional authority to issue the warrant to search Corona-Sanchez's cellular phone because the order directing Sprint to provide HSI with GPS location data was permissible under 18 U.S.C. § 2703(c)(1)(B) and (d).  First, Judge Gossett is clearly a judge in a court of competent jurisdiction within the meaning of 18 U.S.C. § 2711(3)(A)(i).  At the time of the request for the order and search warrant, agents believed Corona-Sanchez would be sending individuals to retrieve the methamphetamine inside Lopez-Acosta's Omaha, Nebraska, garage (TR. 40; Ex. 1).  Judge Gossett has jurisdiction over the District of Nebraska and the offenses investigated stem from a location within Omaha.  Hence, he presides over a court of competent jurisdiction in this case.

Secondly, to obtain the order under 18 U.S.C. § 2703(c)(1)(B) and (d), the government need only offer specific and articulable facts demonstrating reasonable grounds to obtain information from an electronic communication provider.  Here, Agent Allrich stated within his affidavit agents had uncovered approximately thirteen pounds of methamphetamine from Lopez-Acosta's apartment and individuals would soon be retrieving the methamphetamine.  Most importantly, Lopez-Acosta agreed to engage in a consensually-monitored phone call with the man he knew only as Gordo.  During the call, agents believed the conversation amounted to what Lopez-Acosta had initially told them was the plan from the outset:  the unidentified man on the other end of the line would be sending people to retrieve the methamphetamine.  Here, the tip was effectively corroborated by the behavior of the unidentified party on the other end of the call, thereby supporting the truthfulness behind Lopez-Acosta's statements. Accordingly, this court finds the facts articulated within Agent Allrich's affidavit are both specific and articulable, satisfying the requirements of § 2703(d).

As a result, this court finds (1) Judge Gossett had the authority to issue the order directing Sprint to provide HSI with information pertaining to Corona-Sanchez, (2) Agent Allrich supplied sufficiently specific and articulable facts to support the issuance of the order, and (3) any deficiencies in the search warrant are irrelevant because the order was validly issued.

Notwithstanding the sufficiency of the search warrant issued by Judge Gossett, or any theoretical ramifications behind distinguishing historical and prospective GPS data acquired without a warrant, HSI agents in this case relied on a valid act of Congress when carrying out their duties as law enforcement personnel. **See *United States v. Watson***, 423 U.S. 411, 416 (1976) (stating Acts of Congress are afforded a strong presumption of constitutionality). Neither case law nor the statute itself clearly delineate what type of "information" falls within the ambit of § 2703(c). However, any constitutional deficiencies within § 2703(c)(1)(B) are remedied here by the objectively reasonable reliance on its validity by Agent Allrich. **See *United States v. Davis***, --- F.3d ---, WL 2599917 (11th Cir. 2014) (holding the good faith exception to the exclusionary rule applies to the acquisition of cell site location data by law enforcement); ***United States v. Espudo***, 954 F. Supp. 2d 1029, 1044-45 (S.D. Cal. 2013) (holding even though real-time cell site location data falls outside the "information" within § 2703, the officer's reliance on the statute's validity precluded suppression of the information obtained).

### 2. Detention

Corona-Sanchez argues HSI agents unlawfully seized him during the traffic stop. **See** Filing No. 61 - Motion p. 1; Filing No. 65 - Brief p. 10-16. He asserts the detention's duration exceeded the length permissible for investigatory seizures under the Fourth Amendment and he involuntarily consented to a search of his apartment. *Id*. Consequently, he argues any and all evidence obtained subsequent to the traffic stop must be suppressed as tainted fruit of a poisonous tree. **See** Filing No. 61 - Motion p. 1; Filing No. 62 - Motion p. 1, 2.

### i. Vehicle Stop

The Fourth Amendment provides: "The right of the people to be secure in their persons . . . against unreasonable . . . seizures, shall not be violated." **U.S. Const. Amend. IV**. "Determining which police-citizen contacts fall within the protections of the Fourth Amendment and which do not is fact intensive and turns on the unique facts of each case." **United States v. Griffith**, 533 F.3d 979, 983 (8th Cir. 2008). "An investigatory, or **Terry**, stop [of an individual] without a warrant is valid only if police officers have a reasonable and articulable suspicion that criminal activity may be afoot." **United States v. Allen**, 705 F.3d 367, 369-70 (8th Cir. 2013) (**citing Terry v. Ohio**, 392 U.S. 1 (1968)). "Whether the particular facts known to the officer amount to an objective and particularized basis for a reasonable suspicion of criminal activity is determined in light of the totality of the circumstances." **United States v. Garcia**, 23 F.3d 1331, 1334 (8th Cir. 1994). Indeed, the totality of circumstances may justify a reasonable suspicion even when predicated on numerous acts that, when analyzed individually, would not suggest any criminal activity was afoot. **See United States v. Sokolow**, 490 U.S. 1, 9 (1989) (explaining numerous noncriminal acts, when assessed as a whole, may nonetheless justifying reasonable suspicion). However, "when justifying a particular stop, police officers 'must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.'" **Allen**, 705 F.3d at 370 (**quoting Terry**, 392 U.S. at 21). "In deciding whether to conduct a **Terry** stop, an officer may rely on information provided by other officers as well as any information known to the team of officers conducting the investigation." **Id**.

In the present case, an objective agent in these circumstances could reasonably conclude the man in the white SUV was engaged in criminal activity. HSI Agent Wimer of the Omaha division provided Agent Stone in Los Angeles a brief description of Gordo, the location of his phone, as well as the type of vehicle he drove (TR. 45, 52, 53). Agent Stone observed the red Chevrolet pickup with distinctive red rims driven by the target in the same apartment complex where GPS data indicated the phone was located.[4] Additionally, Agent Fernandez witnessed a heavy-set Hispanic male get into

---

[4] Corona-Sanchez argues briefly the area within the gate of the apartment complex is curtilage and as a result, Agent Stone's entrance upon it became an unlawful search. **See** Filing No. 65 - Brief p. 10.

the white SUV and exit the complex.  As the SUV departed, Agent Stone verified with Agent Wimer that the phone was in fact moving from the apartment complex.

Here, the justification for executing the traffic stop was anchored by specific, articulable, and particularized facts that could lead an objective agent to conclude the man in the vehicle was involved in the methamphetamine operation uncovered in Omaha.  Though some of the factors relied upon by agents may appear harmless on their own, when analyzed under the totality of circumstances, a reasonable agent could suspect Corona-Sanchez was not only the individual HSI was looking for, but he was involved in the transportation of methamphetamine.  Accordingly, this court finds there was reasonable suspicion to execute a traffic stop on the white SUV.

### ii. Length of Detention

Corona-Sanchez argues his initial detention began the moment the white SUV was pulled over and continued through the time he was moved to and questioned at his apartment, resulting in an unreasonable seizure in violation of the Fourth Amendment. **See** Filing No. 65 - Brief p. 11, 12.

"A person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave."  **United States v. Grant**, 696 F.3d 780, 784 (8th Cir. 2012).  However, "[a]n officer is allowed to stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity may be afoot."  **United States v. Saenz**, 474 F.3d

---

"Curtilage is the area to which extends the intimate activity associated with the sanctity of a man's home and the privacies of life . . . ."  **United States v. Mathias**, 721 F.3d 952, 955 (8th Cir. 2013) (citation omitted).  Whether an area constitutes curtilage is based on "the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by."  **Id.** (**quoting United States v. Dunn**, 480 U.S. 294, 300 (1987)). Here, the area in question is a space used to park cars.  While a fence does surround Corona-Sanchez's apartment complex, the public can see inside it from across the street, just as Agent Fernandez did in this case.  The proximity of the area where Agent Stone progressed to the actual units is unclear from the record, but clearly a communal parking lot is fundamentally different than an area protecting the intimate activities associated with the sanctity of the home.  **See Mack v. City of Abilene** 461 F.3d 547, 554 (5th Cir. 2006) (applying the **Dunn** factors and determining an apartment complex parking lot was not curtilage, based in part on the fact it was unshielded from view and used as a common area). Accordingly, Agent Stone's entrance into Corona-Sanchez's apartment complex parking lot was not an unlawful search.

1132, 1136 (8th Cir. 2007) (*citing Terry*, 392 U.S. at 30).  "Any detention consequent to an investigative stop must be temporary and must last no longer than necessary." *United States v. Dickson*, 58 F.3d 1258, 1263 (8th Cir. 1995).  "In deciding whether a detention lasts too long to be justified in an investigative stop, and therefore becomes an arrest, we consider whether the police 'diligently pursued' a means of investigation likely to resolve their suspicions quickly."  *Id.*  "Generally, the police may take reasonably necessary steps to 'maintain the status quo of a situation while verifying or dispelling suspicion.'"  *Id.*  Additionally,

> [t]he Supreme Court has long recognized an officer's right to conduct an investigatory stop inherently includes the right to use some degree of physical force or threat to effect the stop.  The use of handcuffs is the use of force, and such force must be objectively reasonable under the circumstances.  With this in mind . . . officers may use handcuffs as a reasonable precaution to protect the officers' safety and maintain the status quo during the *Terry* stop.  However, the use of handcuffs is greater than a de minimus intrusion and thus requires the [officer] to demonstrate that the facts available to the officer would warrant a man of reasonable caution in the belief that the action taken was appropriate.

*El-Ghazzawy v. Berthiaume*, 636 F.3d 452, 457 (8th Cir. 2011) (internal citations omitted).  Further, "[w]hen a motorist gives consent to search his vehicle, he necessarily consents to an extension of the traffic stop while the search is conducted."  *United States v. Garcia*, 613 F.3d 749, 753 (8th Cir. 2010) (citing *United States v. Rivera*, 570 F.3d 1009, 1013 (8th Cir. 2009)).

As a preliminary matter, this court finds Corona-Sanchez was seized for purposes of the Fourth Amendment.  He was never informed he was free to leave, rather, he was told he was being detained.  He was placed in handcuffs immediately after the traffic stop and remained in handcuffs while he was transported in a law enforcement vehicle to his residence.  No reasonable person would feel free to leave in such a scenario.  In fact, the totality of circumstances dictate Corona-Sanchez was seized from the moment HSI pulled him over throughout the questioning at his residence.

Turning to the overall timeframe surrounding Corona-Sanchez's detention, this court concludes the HSI agents' actions were intended to resolve their suspicion the occupant in the white SUV was a party to the trafficking of methamphetamine in Omaha, and was therefore reasonable within the parameters of a *Terry* stop. The transportation of Corona-Sanchez to his apartment after he provided consent[5] to search there remained within the investigative scope of the initial traffic stop. Additionally, the placing of handcuffs on Corona-Sanchez was reasonable given the fact agents were investigating allegations of methamphetamine trafficking; an activity synonymous with violence.

Immediately after HSI agents conducted the traffic stop, Agent Fernandez was dispatched to the scene in order to provide Spanish-speaking assistance. He spoke with Corona-Sanchez for approximately ten minutes before receiving both verbal and written consent to search Corona-Sanchez's apartment. The time between the initial stop and when Agent Fernandez finished speaking to Corona-Sanchez was no more than twenty-five minutes. The twenty-five minutes was reasonable given the fact HSI needed a translator and the questioning was done in diligent pursuit to uncover whether Corona-Sanchez was the individual known as Gordo, whom agents had reason to believe was involved in the trafficking of methamphetamine.

These factors too are relevant in determining the reasonableness behind keeping Corona-Sanchez in handcuffs throughout his detention. The trafficking of narcotics is a dangerous business. The fact agents engaged Corona-Sanchez believing he was involved in the interstate transportation of large amounts of methamphetamine exposed them to the possibility of immediate violence. **See *United States v. Ramirez-Fuentes***, 703 F.3d 1038, 1043 (7th Cir. 2013) (admitting DEA agent's testimony, stating in part, "[t]here's a lot of violence associated with [methamphetamine] and we see a lot of guns with the drugs" over a Fed. R. Evid. 403 objection because it was relevant to the drug trade). In fact, HSI knew there was the potential for conflict. They devoted a substantial amount of manpower to the investigation to assist in surveillance, but more importantly for general safety concerns. The nature of the investigation, coupled with

---

[5] The validity of Corona-Sanchez's consent is discussed below.

13

the fact Corona-Sanchez initially admitted he was illegally present in the United States, justified the agents handcuffing Corona-Sanchez throughout his detention.

The mere fact Corona-Sanchez was transported to his apartment for further questioning does not in and of itself render the detention unreasonable. Just as consent to search a vehicle during a traffic stop extends an initial detention, Corona-Sanchez's consent to search his house is afforded the same effect. It makes little sense to treat the scenarios differently, especially when, as is the case here, a residence could contain evidence relevant to the very same suspicion that predicated the *Terry* stop. The request to search Corona-Sanchez's residence was prompted by his own admission he had cash in his apartment. Accordingly, it was reasonable for agents to suspect the money was related to the same narcotics trafficking with which the initial vehicle stop was executed. Thus, when Corona-Sanchez provided agents consent to search his residence, he effectively consented to an extension of the investigation for which he was being detained. Therefore, the only issue remaining is whether he knowingly, intelligently, and voluntarily consented.

"While the Fourth Amendment does not permit warrantless searches, law enforcement may conduct such a search if they obtain [the owner's] voluntary consent." *United States v. Quintero*, 648 F.3d 660, 667 (8th Cir. 2011). "A consensual search does not violate the Fourth Amendment if the consent was voluntarily given without coercion." *United States v. Meza-Gonzalez*, 394 F.3d 587, 592 (8th Cir. 2005). Such "[v]oluntariness is a question of fact to be determined from all the circumstances." *Ohio v. Robinette*, 519 U.S. 33, 40 (1996). Some personal characteristics that aid in determining voluntariness of consent are age, intelligence, whether an individual was under the influence of drugs or alcohol, whether an individual was read his *Miranda* rights, and whether an individual had experienced prior arrests. **See *Quintero***, 648 F.3d at 667 (listing factors). A court may also look at environmental factors including, the period of time that the individual was detained; whether the police threatened, physically intimidated, or punished the individual; whether promises or misrepresentations were made upon which the individual relied; whether the individual was in custody or under arrest at the time of consent; whether the consent occurred in a public or secluded place; and whether the individual objected or stood by silently while

the search occurred. *Id*. "In order for a consensual search to be valid, consent must actually be given (either express or implied), and the person giving consent must have (actual or apparent) authority to do so." *United States v. Luken*, 560 F.3d 741, 744 (8th Cir. 2009). "The government has the burden to prove the consent was voluntary by a preponderance of the evidence and based upon the totality of the circumstances." *United States v. Beasley*, 688 F.3d 523, 531 (8th Cir. 2012).

Though he was in handcuffs at the time and was not provided *Miranda* warnings, the totality of circumstances demonstrate Corona-Sanchez was not coerced into giving HSI consent to search his residence. Corona-Sanchez appeared to be an adult of average intelligence, was not under the influence of drugs or alcohol, was never physically or emotionally intimidated, and expressly provided consent in a public place. His conversation with Agent Fernandez was casual and agents never displayed their firearms. Furthermore, he signed a voluntary consent form, which was read to him prior to his signing. The facts of this case overwhelmingly demonstrate Corona-Sanchez provided a valid waiver of his Fourth Amendment rights during the investigatory traffic stop.

Thus, this court finds (1) Corona-Sanchez remained seized from the initial vehicle stop throughout the questioning at his apartment, but (2) prior to providing consent to search his apartment, his detention lasting approximately twenty-five minutes was objectively reasonable, (3) Corona-Sanchez voluntarily consented to the search of his apartment, (4) his consent to search effectuated an extension of the investigation stemming from the initial vehicle stop, and as a result, (5) the seizure of his person at all times during HSI's investigation was reasonable under the Fourth Amendment.

## B. Fifth Amendment Claims

Corona-Sanchez seeks to suppress all statements made to HSI agents during the course of their investigation as violations of the Fifth Amendment. **See** Filing No. 61 - Motion p. 1. Corona-Sanchez argues any and all statements he made were during a custodial interrogation. *Id.* Additionally, he contends each of his statements was provided in the absence of proper *Miranda* warnings and they were not made freely, voluntarily, or intelligently. *Id.*

### 1. Statements Made at Initial Traffic Stop

It is well settled that a law enforcement official is required to advise an individual of his or her *Miranda* rights before questioning if that individual is in custody.  ***United States v. Muhlenbruch***, 634 F.3d 987, 995 (8th Cir. 2011).  "An individual is in custody [for purposes of *Miranda*] when placed under formal arrest, or when his or her freedom is restricted to a degree akin to formal arrest."  ***United States v. Elzahabi***, 557 F.3d 879, 883 (8th Cir. 2009).  Whether a defendant was "in custody" is an objective inquiry.  ***J.D.B. v. North Carolina***, 131 S. Ct. 2394, 2402 (2011).  Two discrete inquiries are essential to the determination:

> [F]irst, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was at liberty to terminate the interrogation and leave. . . .  [T]he court must apply an objective test to resolve the ultimate inquiry:  was there a formal arrest or restraint on freedom of movement of the degree associated with formal arrest.

*Id.* (quoting *Thompson v. Keohane*, 516 U.S. 99, 112 (1995)).

The Eighth Circuit has identified the following six non-exclusive factors to consider when determining whether an individual is in custody:

> (1) whether police told the suspect "that the questioning was voluntary," the suspect could leave or ask the officers to do so, "or that the suspect was not considered under arrest"; (2) whether the suspect's movement was restrained during the questioning; (3) "whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions"; (4) whether police used "strong arm tactics or deceptive stratagems" during questioning; (5) "whether the atmosphere of the questioning was police dominated"; and (6) whether the suspect was arrested at the end of the questioning.

*United States v. Cowan*, 674 F.3d 947, 957 (8th Cir. 2012) (**quoting** *United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990)).  Application of these factors is not mechanical and the issue of whether an individual is in custody "cannot be resolved merely by counting up the number of factors on each side of the balance and rendering a decision accordingly."  ***United States v. Czichrary***, 378 F.3d 822, 827-28 (8th Cir. 2004); **see also** *United States v. Perrin*, 659 F.3d 718, 720 (8th Cir. 2011) ("*Griffin* is simply a rubric for considering the ultimate issue, not a mandatory checklist.").  From

this principal it follows that the presence or absence of any one factor is not determinative on the issue. **See *Griffin***, 922 F.2d at 1347. Instead, a court must "examine the extent of the physical or psychological restraints placed on the suspect during interrogation in light of whether a 'reasonable person in the suspect's position would have understood his situation' to be one of custody." ***Id.*** (**quoting *Berkemer v. McCarty***, 468 U.S. 420, 440 (1984)). The "most obvious and effective means of demonstrating that a suspect has not been taken into custody" is expressly advising the suspect that he is not under arrest and that his participation in questioning is voluntary. ***United States v. Brave Heart***, 397 F.3d 1035, 1039 (8th Cir. 2005) (**quoting *Griffin***, 922 F.2d at 1349).

***Miranda*** does not apply to a defendant who was not in custody during questioning. ***United States v. Kelly***, 329 F.3d 624, 630 (8th Cir. 2003). "Interrogation in the ***Miranda*** context refers to express questioning and to words or conduct that officers should know is reasonably likely to elicit an incriminating response from the suspect." ***United States v. Crisolis-Gonzalez***, 742 F.3d 830, 836 (8th Cir. 2014) (internal quotation marks omitted).

> Interrogation occurs when a law enforcement officer engages in either express questioning or its functional equivalent, which includes any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.

***United States v. Hernandez-Mendoza***, 600 F.3d 971, 976-77 (8th Cir. 2010) (**citing *Innis***, 446 U.S. at 301). "[S]tatements made by a custodial suspect in response to interrogation are inadmissible unless the suspect has voluntarily, knowingly, and intelligently waived his right against self-incrimination." ***United States v. Binion***, 570 F.3d 1034, 1040 (8th Cir. 2009). However, "[a]ny statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence." ***Miranda v. Arizona***, 384 U.S. 436, 478 (1966).

Here, Corona-Sanchez was in custody and asked a question likely to elicit an incriminating response. He was stopped by HSI agents, placed in handcuffs, and told to sit on a curb until Agent Fernandez arrived to provide Spanish-speaking assistance. He was not free to leave and informed only that he was being detained. While the record

does not indicate any strong arm tactics were used, and though the encounter occurred in public, a reasonable person who was placed in handcuffs on the side of the road would believe his freedom was restricted in a way synonymous with formal arrest. Additionally, when Agent Fernandez specifically asked Corona-Sanchez whether he had any drugs, guns, or money in his home, he engaged in direct questioning aimed at eliciting an incriminating response. Prior to undergoing a custodial interrogation, Corona-Sanchez did not receive *Miranda* warnings. Consistent with the teachings of *Miranda*, this court finds Corona-Sanchez's statement in response to whether he had any drugs, guns, or money in his home is inadmissible and therefore should be suppressed as a violation of the Fifth Amendment.[6]

Here, where Corona-Sanchez also made statements after being advised of his *Miranda* rights, the court must determine if Corona-Sanchez's statement during the traffic stop was voluntary. While a *Miranda* violation creates a presumption a defendant's statements were compelled, the statement may nonetheless be voluntary under the Fifth Amendment. **See *United States v. Briones***, 390 F.3d 610, 614 (8th Cir. 2004). "[T]he finder of fact must examine the surrounding circumstances and entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements." ***Elstad***, 470 U.S. at 318. "The test for determining the voluntariness of a confession is whether, in light of the totality of the circumstances, pressures exerted upon the suspect have overborne his will." ***United States v. Aldridge***, 664 F.3d 705, 712 (8th Cir. 2011). "Those potential circumstances include . . . the crucial element of police coercion, the length of the interrogation, its location, its continuity, the defendant's maturity, education, physical condition, [ ] mental health, [and] the failure of police to advise the defendant of his rights to remain silent and to have counsel present during custodial interrogation." ***United States v. Hambrick***, 630 F.3d 742, 749 (8th Cir. 2011).

---

[6] The consent to search remains valid under the Fourth Amendment for the reasons set forth above, but the introduction of Corona-Sanchez's ***statement*** relating to the money at his apartment is inadmissible. However, the court notes a violation of *Miranda* does not require the suppression of physical evidence that is fruit of a custodial interrogation conducted without *Miranda* warnings. **See *United States v. Patane***, 542 U.S. 630, 642-44 (2004); ***United States v. Morgan***, 729 F.3d 1086, 1091 (8th Cir. 2013). Moreover, any statements made later must be scrutinized for voluntariness, an analysis that probes whether *Miranda* was effectively administered before the subsequent statements. **See *Oregon v. Elstad***, 470 U.S. 298, 309 (1985).

The United States Supreme Court has previously explained "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary[.]'" *Colorado v. Connelly,* 479 U.S. 157, 167 (1986); see *United States v. Robinson*, 20 F.3d 320, 322 (8th Cir. 1994).

There is no evidence the agents' conduct was sufficient to overwhelm Corona-Sanchez's will. While the agents had Corona-Sanchez in handcuffs and he was not *Mirandized*, he was nevertheless in public, Agent Fernandez's tone was calm and casual, no weapons were drawn, and Agent Fernandez did not assert any physical or mental coercion. Additionally, Corona-Sanchez did not appear under the influence of alcohol or narcotics and appeared to be of average intelligence. Therefore, the totality of the circumstances establish Corona-Sanchez's unwarned statement was voluntary and not a result of coercion.

### 2. Statements Made at the Apartment

Under the Fifth Amendment, even if a *Miranda* violation occurs, subsequent statements are not automatically rendered inadmissible. **See** *Elstad*, 470 U.S. at 298. The Supreme Court in *Elstad* stated:

> It is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period. Though *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made.

*Id.* at 309; **see also** *United States v. Villalba-Alvarado*, 345 F.3d 1007, 1010 (8th Cir. 2003). Additionally, "[w]arned statements elicited after an initial *Miranda* violation may be admissible, so long as officers do not purposefully elicit an unwarned confession from a suspect in an effort to circumvent *Miranda* requirements." *Morgan*, 729 F.3d at 1091-92; **see** *Missouri v. Seibert*, 542 U.S. 600 (2004).

A defendant's waiver of his *Miranda* rights must be made voluntarily, knowingly, and intelligently.  *Miranda*, 384 U.S. at 444.  When determining whether a waiver was made voluntarily, knowingly, and intelligently, the court must consider:

> First, the waiver must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  Second, the suspect must have waived his rights with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.

*United States v. Vinton*, 631 F.3d 476, 483 (8th Cir. 2011).  "The government has the burden of proving the validity of the *Miranda* waiver by a preponderance of the evidence."  *United States v. Haggard*, 368 F.3d 1020, 1024 (8th Cir. 2004).  "To determine whether a waiver . . . was voluntary, a court looks at the totality of the circumstances and must determine whether the individuals will was overborne."  *United States v. Syslo*, 303 F.3d 860, 866 (8th Cir. 2002).

The agents clearly subjected Corona-Sanchez to a custodial interrogation at his apartment.  Although the record is unclear whether he had handcuffs on at the apartment, he was not informed he was free to leave, and multiple agents had entered his apartment.  However, an important factual distinction between the circumstances surrounding Corona-Sanchez's interrogation during the traffic stop and the interrogation at his apartment, is that prior to questioning at his apartment, he was read his *Miranda* rights.  As explained above, there is no evidence Agent Fernandez used any form of compulsion in eliciting Corona-Sanchez's first statement.  Additionally, the evidence shows Corona-Sanchez's waiver of his *Miranda* rights before he made statements at his apartment was knowing, voluntary, or intelligent.  Further, there is no evidence Corona-Sanchez's later statements were coerced.  The evidence shows Corona-Sanchez understood his *Miranda* rights, expressly waived his rights, and indicated to the agents he was willing to speak with them.  Therefore, the totality of the circumstances indicated Corona-Sanchez's statements at his apartment were made following a knowing, voluntary, and intelligent waiver of his *Miranda* rights.  Under these circumstances, Corona-Sanchez's illegally obtained prior statement during the traffic stop, that he had money in his apartment, does not invalidate and require suppression of his later statements.

### 3. Statements Made at the Bell Police Department

There is no dispute as to whether Corona-Sanchez was interrogated or in custody when questioned by Agent Fernandez at the Bell Police Department on July 17, 2013.    Rather, Corona-Sanchez argues he neither received adequate *Miranda* warnings nor did he knowingly, intelligently, and voluntarily waive his Fifth Amendment rights.  **See** Filing No. 61 - Motion p. 1.

"*Miranda* does not necessarily require that a suspect be warned anew each time he is questioned."  ***United States v. Pruden***, 398 F.3d 241, 246 (3rd Cir. 2005). Instead, "the question whether a suspect needs to be warned when questioning resumes boils down to whether the suspect can and does effectively waive his *Miranda* rights at the second questioning."  ***Id.***  "The determination of whether a defendant has knowingly and voluntarily waived his *Miranda* rights is an extremely fact sensitive analysis."  ***United States v. Nguyen***, 608 F.3d 368, 375 (8th Cir. 2010) (**citing *United States v. Boyd***, 180 F.3d 967, 977 (8th Cir. 1999)).  Currently, there is no bright line demarcation in the Eighth Circuit illuminating the point in which law enforcement must re-*Mirandize* a defendant verbatim.  **See *Nguyen***, 608 F.3d at 375 (holding a three-day time lapse between initial *Miranda* warnings and further questioning was permissible based on a narrow set of facts, including, among others, that the defendant was given full *Miranda* warnings during the first round of questioning, he fully understood his rights at all stages of questioning, and he was consistently interviewed by the same law enforcement personnel); **see also *Biddy v. Diamond***, 516 F.2d 118, 120-21 (5th Cir. 1975) (determining a word-for-word recitation of *Miranda* was not required during subsequent questioning when the defendant had expressly waived her rights, even though the questioning took place more than ten days after it was originally provided).

In this case, Agent Fernandez was not required to re-read Corona-Sanchez his *Miranda* rights in their entirety prior to questioning on July 17, 2013.  Rather, the simple questioning of whether Corona-Sanchez remembered his rights and whether he was willing to waive his rights before answering questions suffices for purposes of *Miranda*. The same standards for determining whether a waiver was voluntary apply once again

here, but none of the facts suggests Corona-Sanchez's waiver was anything other than knowing, intelligent, and voluntary.

In the present case, Corona-Sanchez was read his *Miranda* rights from an HSI department issued card on July 16.  When agents read aloud from the card, suspects are informed of their rights, asked if they understand their rights, and asked whether they would be willing to waive said rights and talk to law enforcement.  **See** Ex. 4.  Corona-Sanchez plainly acknowledged he understood his rights but was willing to talk nonetheless.  The questioning performed at the Bell Police Department was conducted the very next day and only after Corona-Sanchez had been asked if he remembered his *Miranda* rights and had confirmed that he did.  Accordingly, this court finds prior to questioning on July 17, Corona-Sanchez was adequately informed of his *Miranda* rights and he knowingly, intelligently, and voluntarily waived his rights.

### IT IS RECOMMENDED TO CHIEF JUDGE LAURIE SMITH CAMP that:

1. Corona-Sanchez's motion to suppress statements (Filing No. 61) be granted to the extent his statements during the traffic stop relating to money at his apartment be suppressed, but denied in all other respects.

2. Corona-Sanchez's remaining motions (Filing Nos. 60, 62) be denied.

### ADMONITION

Pursuant to NECrimR 59.2 any objection to this Order and Findings and Recommendation shall be filed with the Clerk of the Court within fourteen (14) days after being served with a copy of this Order and Findings and Recommendation. Failure to timely object may constitute a waiver of any such objection.  The brief in support of any objection shall be filed at the time of filing such objection.  Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

Dated this 23rd day of June, 2014.

BY THE COURT:

s/ Thomas D. Thalken
United States Magistrate Judge